IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2013 Session

## STATE OF TENNESSEE v. BRIAN MARSHALL KEYS

**Appeal from the Circuit Court for Maury County**
**No. 20889     Robert L. Holloway, Judge**
_____

**No. M2012-02245-CCA-R3-CD - Filed January 29, 2014**
_____

A Maury County jury convicted the Defendant, Brian Marshall Keys, of one count of selling 0.5 grams or more of cocaine within 1,000 feet of a school and two counts of selling less than 0.5 grams of cocaine within 1,000 feet of a school.  The trial court ordered the Defendant to serve an effective sentence of fifteen years.  On appeal, the Defendant asserts that the trial court erred when it denied his constitutional challenge to the Drug-Free School Zone Act and that the evidence is insufficient to support his convictions.  After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Hershell D. Koger (on appeal), Pulaski, Tennessee; and James M. Marshall (at trial), Spring Hill, Tennessee, for the appellant, Brian Marshall Keys.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Mike Bottoms, District Attorney General; and Brent Cooper, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's sale of cocaine within 1,000 feet of a school. A Maury County grand jury indicted the Defendant for one count of selling 0.5 grams or more of cocaine with 1,000 feet of a school, a Class A felony, and two counts of selling less than 0.5 grams of cocaine within 1,000 feet of a school, a Class B felony.

At a trial on these charges, the parties presented the following evidence: Brian Ridley, a Columbia Police Department officer, testified that the Narcotics and Vice Unit used confidential informants for drug investigations. He explained that, because Columbia, Tennessee, was a "small community," police officers working undercover on illegal drug sales would be "easily recognized." Officer Ridley said that, generally, confidential informants worked with his unit because they had pending drug charges or because they offered to help based upon a concern about a drug problem in the community.

Officer Ridley testified that a confidential informant was used in this case. Officer Ridley met with the confidential informant, Gartner Fralix, on March 22, 2011, to conduct a controlled buy from the Defendant. Officer Ridley recalled that Mr. Fralix contacted his office to notified police of the time and location of the arranged drug buy. Officer Ridley said that confidential informants often notify police of drug sales without any police involvement in the arrangement of the buy. Officer Ridley said that, in this case, Mr. Fralix had arranged to buy cocaine from the Defendant. The Defendant was to deliver one gram of cocaine to Mr. Fralix at his mobile home, which was located near Columbia Academy. Officer Ridley confirmed that police did not select the location for the drug buy. Officer Ridley stated that he believed the location was selected because Mr. Fralix did not have a driver's license or transportation. Officer Ridley said that, at the time of the drug transaction, he was unaware that Mr. Fralix's mobile home was within 1,000 feet of the school. The distance between Mr. Fralix's home and the school was determined after the transaction.

Officer Ridley testified that he met with Mr. Fralix before the controlled buy. He searched Mr. Fralix, fitted him with a covert camera and audio recording device, and provided him with $100.00 in cash to purchase the cocaine. The cash consisted of bills that had been photocopied. Officer Ridley stated that he monitored the controlled buy both visually and through the audio equipment. He explained that his position close to the trailer and the location of the purchase allowed him to observe Mr. Fralix enter and exit the trailer to return the drugs to the police. While Mr. Fralix was inside the trailer, outside the view of the officers, Officer Ridley relied on the audio to monitor the sale.

Officer Ridley testified that Mr. Fralix returned to him immediately after the sale. Officer Ridley retrieved the camera, "a plastic baggie containing a white substance," and then interviewed Mr. Fralix about the sale. Officer Ridley said that he conducted a "field test" of the white substance, which tested positive for cocaine. He then sent the substance to the Tennessee Bureau of Investigation ("TBI") for further analysis.

Officer Ridley confirmed that Mr. Fralix arranged for two additional controlled buys with the Defendant on March 23 and March 24, 2011. Officer Ridley said that he followed the same procedure as the March 22 controlled buy. He met with Mr. Fralix both before and after the transaction and monitored the transaction visually and through audio equipment. Officer Ridley confirmed that the information learned through the post-buy interviews with

Mr. Fralix was consistent with the recordings of the transactions that he later viewed at the police station.

On cross-examination, Officer Ridley testified that, at the time of this incident, Mr. Fralix had pending charges for the sale of marijuana. Officer Ridley said that he weighed the white substance obtained in each purchase before sending it to the TBI for further analysis. He said the weights were 0.9, 0.4, and 0.5 grams. Officer Ridley explained that the TBI weighed the three sets of drugs at 0.7, 0.2, and 0.3 grams. He explained that his weight was different because the TBI weighed the drugs out of the plastic bag, but his weights included the weight of the plastic baggie. Officer Ridley agreed that Mr. Fralix's mobile home was not searched before the drug transaction. He explained that he did not search the trailer because Columbia is a small community where he would easily be recognized entering the trailer. Officer Ridley agreed that he was not standing inside the trailer during the drug sale but noted that he viewed the entire transaction on the video recording.

On redirect examination, Officer Ridley explained why police do not try to control the location set-up by a confidential informant:

[W]hen people buy narcotics, it's usually done in a certain way. There's - - there's like a routine, I guess you could say.

And we try not to deviate from that, because drug dealers are very suspicious people, and you know, if you do four drug deals in one spot and you change it on the last one, you know, sometimes that - - that makes them suspicious.

And the only time that I would ever change the location of a drug deal, as far as them telling me the way they - - they want to have it happen[ ], is for safety reasons. You know, we're not going to do [it] in a parking lot of a daycare or something where - - where children are present or - - that would be the only reason that I would deter an informant from d[o]ing a deal in a certain spot.

Gartner Fralix, the confidential informant, testified that he had prior felony convictions for sale of cocaine, possession of marijuana, theft over $500.00, and possession of a Schedule IV drug. He said that in March 2011 he was charged with possession of marijuana. Mr. Fralix said that he also had a pending charge for sale of marijuana. His attorney arranged with police for Mr. Fralix to work with officers on controlled buys. Mr. Fralix said that, in return, he hoped that his sale of marijuana charge would be "dropped." He said that he worked with Brian Grey. Officer Grey told him if he worked with police, police would "not bring [his] sale charges up." Mr. Fralix stated that he worked for police on four or five "other cases," which included his transactions with the Defendant. In

exchange for his work, police did not charge Mr. Fralix with sale of marijuana.

Mr. Fralix testified that he provided the police with names of drug dealers, one of whom was the Defendant. He explained that he had known the Defendant since he was "real young." Approximately five days before the controlled buy, Mr. Fralix saw the Defendant at the hospital, and the two men exchanged phone numbers. Knowing that the Defendant sold drugs, Mr. Fralix called the Defendant and asked "[i]f he could get some dope." The Defendant said that he could obtain some cocaine, and the men agreed the Defendant would bring the cocaine to Mr. Fralix's mobile home. Mr. Fralix said that the police played no role in where the controlled buy would be conducted.

Mr. Fralix said that, after arranging the buy with the Defendant, he notified police. He said that he met with officers in an "old abandoned building" located approximately fifty feet from his trailer. Mr. Fralix said that he and his "old lady," Deanna Spoon, lived in the trailer. He said that she was not in any trouble at the time but agreed to help him with the controlled buy because "she loved [him]." Mr. Fralix confirmed that the police provided him with a camera to record the transaction. The video was played for the jury, and Mr. Fralix identified the building where he met with the police and received the camera. Mr. Fralix said that the police also gave him $100.00 in cash to buy one gram of cocaine. Mr. Fralix said that he had told the Defendant the cocaine was for Ms. Spoon.

Mr. Fralix testified that he carried the activated camera in his hand as he walked back to his trailer. From the video, he identified the living room of his trailer and Ms. Spoon's voice. Mr. Fralix said he returned a phone call to the Defendant, whose voice could be heard through the phone, and confirmed he was in trailer six. Mr. Fralix said that he placed the camera on a cabinet and gave the $100.00 to Ms. Spoon. Mr. Fralix identified, on the video recording, the Defendant entering the trailer. Mr. Fralix acknowledged that, on the video, the Defendant was seen handing an item to Ms. Spoon. Mr. Fralix said that the item was the cocaine.

Mr. Fralix testified that, after the Defendant left, Mr. Fralix took the cocaine from Ms. Spoon, walked out the back door, and went directly to the building where the police were waiting. He explained that, as soon as he stepped outside his trailer, the police had a clear view of him. Mr. Fralix said that he gave the police the cocaine, returned the police equipment, and then relayed to the police the details of the drug transaction.

Mr. Fralix said that the following day, March 23, 2011, he once again arranged for a purchase from the Defendant. He confirmed that the details and procedure on the second day were the same as on the first day. Once again, Mr. Fralix arranged to buy one gram of cocaine for $100.00. On the video recording of the second transaction, which was played for the jury, the Defendant urges Mr. Fralix and Ms. Spoon to buy an "eight-ball" rather than a gram. Before the Defendant arrived, Mr. Fralix can be heard on the recording advising Ms.

Spoon to tell the Defendant that she "could only pull 200 out of [her] card a day" as the reason why she could not purchase an eight-ball. Mr. Fralix testified that, after the Defendant arrived, the Defendant pulled Mr. Fralix aside and asked if he wanted to buy some "morphines." According to Mr. Fralix, the Defendant had a large amount of morphine pills, and he did not want "to sit on them."

Mr. Fralix testified that, during the second transaction, the Defendant kept encouraging him to "do a line" to try the cocaine. Mr. Fralix said that "he hope[d] it don't [sic] happen" because he was prohibited from using any drug while working with the police. Ms. Spoon was in the process of "breaking" the cocaine down on a plate when the Defendant's "phone kept on ringing," and the Defendant left abruptly before anyone ingested the cocaine. After the Defendant left, police instructed Mr. Fralix to pour the cocaine from the plate back into the plastic bag and bring it to them.

Mr. Fralix testified about the third transaction, saying that the Defendant contacted him early in the day on March 24, 2011, to set a time. Mr. Fralix said that during the previous transaction on March 23, 2011, he told the Defendant he would buy an "eight-ball" for $250.00 the next day, March 24. On March 24, however, Mr. Fralix once again arranged to buy one gram for $100.00. Mr. Fralix testified that, during the course of the three transactions, the Defendant never expressed any concern over the location of the sale or suggested an alternate location. Mr. Fralix described the Defendant as "eager" to sell the cocaine, exhibiting no signs of hesitancy.

Mr. Fralix testified that the same routine was followed for the third transaction; he arranged the buy with the Defendant, contacted police, and then met with police to obtain the camera and money. Mr. Fralix said that he notified the police when the Defendant arrived. The Defendant entered, handed Ms. Spoon the cocaine, and she handed him the money. After the Defendant left, Mr. Fralix once again returned the drugs and camera to the police. Mr. Fralix stated that neither he nor Ms. Spoon ever used any of the cocaine purchased from the Defendant. Mr. Fralix said that he could not explain why the TBI weights indicated less than a gram. He said that he turned the drugs over to police exactly as he had received them from the Defendant.

Mr. Fralix explained that he used Ms. Spoon in the transactions because he had just been released from jail and, therefore, it was not plausible that he would have $100.00 three days in a row. Mr. Fralix said that police did not tell him what to say at trial but that they did tell him that he "might have" to testify. He said that the only instruction he received regarding his trial testimony was to "be honest."

On cross-examination, Mr. Fralix agreed that he had been "caught selling" marijuana, and this was the reason he agreed to cooperate with police and work as a confidential informant. Mr. Fralix explained that he had sold marijuana at the trailer next door to the one

shared by him and Ms. Spoon and that the police charged him with sale within a school zone. The agreement between Mr. Fralix and the police required Mr. Fralix to conduct controlled buys with four different drug dealers. The Defendant was the third of the four required. Mr. Fralix explained that he had already completed two of the required transactions before the controlled buys with the Defendant and that he completed the fourth at some point thereafter. Mr. Fralix testified that, since the fourth transaction, he had continued to work with the police willingly.

On redirect examination, Mr. Fralix testified that the school, Columbia Academy, could be seen when entering his neighborhood. Mr. Fralix said that the route that the Defendant took to Mr. Fralix's trailer on the day of one drug sale took him past Columbia Academy.

Deanna Spoon testified that she was engaged to marry Gartner Fralix. She stated that, at the time of these events, she did not have any charges pending against her and that she was not on probation. Ms. Spoon said that she was aware of Mr. Fralix's pending charges and explained that it was her trailer where the controlled buys occurred. Ms. Spoon said that she offered to help Mr. Fralix with the controlled buys if he needed her because she "loved him."

Ms. Spoon testified that she was aware that Mr. Fralix had a police camera and was recording each of the controlled buys. She had since reviewed the video recordings and confirmed that the recordings were consistent with the events she witnessed on March 22, 23, and 24, 2011. Portions of the video recordings were played, and Ms. Spoon confirmed that the Defendant handed her cocaine in the various segments shown. She also identified the portion of the video in which she handed the Defendant money in exchange for the cocaine. She confirmed that all three transactions involved $100.00 for one gram of cocaine.

Ms. Spoon testified that, during one of the transactions, the Defendant encouraged her to try the cocaine. She said that she stalled by fumbling with the tie on the bag until the Defendant took the bag from her and poured a small amount of the cocaine out. She said she was pregnant at the time and could not "do anything like that." She recalled that the Defendant received a phone call and left, so she did not have to sample the cocaine. She stated that neither she nor Mr. Fralix used or kept any of the cocaine the Defendant delivered. She testified that all of the cocaine was taken to the police immediately following the transactions.

Jennifer Sullivan, a forensic scientist employed by the TBI, testified as an expert witness in the field of drug analysis and identification. Agent Sullivan stated that she tested the substances submitted in this case and confirmed that the substances contained cocaine. Agent Sullivan said that she weighed each of the three sets of substances in this case. The substance exchanged on March 22, 2011, weighed 0.7 grams; the substance exchanged on March 23, 2011, weighed 0.2 grams; and the substance exchanged on March 24, 2011,

weighed 0.3 grams.

Brian Grey, a Columbia Police Department officer, testified that he was assigned to the Police Department's Narcotic and Vice Unit. He estimated that approximately 65 percent or 70 percent of the cases he dealt with involved cocaine, and in all of these cases involving cocaine he worked with a confidential informant. Officer Grey explained that in a "small town," officers are "known pretty good," making it difficult to conduct controlled buys using a law enforcement officer.

Officer Grey testified that, in 2010, he conducted a series of controlled buys where a confidential informant bought marijuana from Mr. Fralix. As a result, Mr. Fralix was charged with felony possession of marijuana in a drug free zone. Mr. Fralix's attorney approached the police about the possibility of Mr. Fralix working as a confidential informant for the police. Officer Grey said that he interviewed Mr. Fralix and that ultimately, Mr. Fralix agreed to work with police. Officer Grey said that the agreement required Mr. Fralix to help police conduct controlled buys with three to four people selling marijuana.

Officer Grey testified that, based upon his underlying investigation of Mr. Fralix's charges, he was aware that the controlled buys involving the Defendant were in a school zone. He explained that, generally, confidential informants arrange for the location of the sale. He said that if police designate the location and it is later determined to be in a drug-free zone, the police do not pursue the drug-free zone enhancement. Officer Grey explained the process he went through in measuring the distance between the trailer and the school. He then identified photographs taken during the process of measuring the distance and stated that the school was 846 feet and one-fourth of an inch from the trailer where the drug transactions occurred.

On cross-examination, Officer Grey stated that, at the time of the controlled buys, he was unaware that Mr. Fralix did not have a car. He said that he had observed a car at the residence. Officer Grey confirmed that he knew that Mr. Fralix did not have a driver's license. Officer Grey said that he did not participate in selecting the location for the controlled buys. He said that Mr. Fralix contacted him after the arrangements with the Defendant were made and notified him of the details.

The Defendant testified that he went to Mr. Fralix's trailer with "the intent to sell cocaine." He explained that, normally, "people would come to [him] and buy the drugs from [him]" but that Mr. Fralix told the Defendant that he did not "have a ride." The Defendant stated that he asked Mr. Fralix if they could meet elsewhere, but Mr. Fralix said, "No, you got to come over here." The Defendant explained, "So I went there, because I felt like that was the only way that he was going to get the services rendered, if I brought what he asked for, because there was no means of transportation from him."

The Defendant testified that he was unaware at the time that the trailer was near a school. He stated, "I don't want to be selling drugs around any kids." The Defendant said that the route he drove to the trailer did not take him past Columbia Academy. He reiterated that had he known that the trailer was located in a school zone, he would not have agreed to deliver the cocaine to the trailer. The Defendant said that he felt that he was "persuaded" by Mr. Fralix to come to the trailer because Mr. Fralix would not meet him elsewhere.

The Defendant testified that he had prior criminal convictions for possession of small amounts of drugs. The Defendant said that he had a cocaine addiction and sold drugs to support his "habit."

On cross-examination, the Defendant confirmed that he sold drugs. He agreed that he had lived most of his life in Maury County and that he knew the location of Columbia Academy. The Defendant said that he was "suspicious" of Mr. Fralix and Ms. Spoon but that he agreed to return to the trailer two more times in the following days and talk with Mr. Fralix and Ms. Spoon about possibly buying larger amounts of cocaine.

After hearing the evidence, the jury convicted the Defendant of one count of selling 0.5 grams or more of cocaine within 1,000 feet of a school and two counts of selling less than 0.5 grams of cocaine within 1,000 feet of a school. The trial court ordered the Defendant to serve an effective sentence of fifteen years for his convictions. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal the Defendant argues that the trial court erred when it denied his motion to declare Tennessee Code Annotated sections 39-17-432(b)(1) and 432(c) unconstitutional and that the jury's rejection of the entrapment defense was not supported by the proof. The State responds that the challenged statutes are constitutional and that the evidence supports the jury's rejection of an entrapment defense in this case.

### A. Constitutionality of the Drug-Free School Zone Act

The Defendant contends that the Drug-Free School Zone Act is unconstitutional. He asserts that the provisions of Tennessee Code Annotated section 39-17-432(b)(1) and (c) constitute cruel and unusual punishment and that the 1,000-feet provision is unconstitutionally arbitrary. The State responds that the Defendant has waived his challenge to the constitutionality of a statute by failing to raise the issue in a pre-trial motion and that the Defendant's challenge is without merit. We agree with the State.

The Tennessee Rules of Criminal Procedure mandate that certain issues be raised before trial, including "[d]efenses and objections based on defects in the indictment,

presentment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)." This Court has previously applied the Rule 12 waiver rule to constitutional challenges to the Drug-Free School Zone Act. *See State v. Roberto Vasques*, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *21-22 (Tenn. Crim. App., at Nashville, Oct. 7, 2005), *perm. app. denied* (Tenn. March 12, 2007); *see also State v. Smith*, 48 S.W.3d 159, 162 n.1 (Tenn. Crim. App. 2000) (noting the Rule 12 waiver for failure to file a pre-trial motion but hearing the issue on the merits because the State failed to raise waiver on appeal). In this case, both parties agree that the Defendant did not file a pre-trial motion attacking the constitutionality of the Drug-Free School Zone Act. Thus, application of the doctrine of waiver is appropriate.

Waiver notwithstanding, we note that the issue raised by the Defendant on appeal has previously been addressed by this Court. This Court has held that the sentencing provisions of the Drug-Free School Zone Act do not violate the constitutional protections against cruel and unusual punishment. *State v. Jenkins*, 15 S.W.3d 914, 919 (Tenn. Crim. App. 1999); *Smith*, 48 S.W.3d at 173*; State v. Antonio Rico Walls*, No. M1998-00358-CCA-R3-CD, 2002 WL 1343234, at *3 (Tenn. Crim. App., at Nashville, June 20, 2002), *perm. app. denied* (Tenn. Nov. 12, 2002).

As to the Defendant's argument that the 1,000-foot provision of the Drug-Free School Zone Act is not related to the purpose of the statute, this Court has previously rejected a substantive due process attack on the Act by noting the rational relationship between the scope of the Act and the legitimate interest of the State. *Smith*, 48 S.W.3d at 170.

Tennessee Code Annotated section 39-17-432, the Drug Free School Zone Act, states:

> A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b) - (i) for such violation.

T.C.A. § 39-17-432(b) (2006). The legislature expressed its intent, through this Act, to "provid[e] all vulnerable persons in this state an environment in which they can learn, play and enjoy themselves without the distractions and dangers that are incident to the occurrence of illegal drug activities." T.C.A. § 39-17-432(a); *see also State v. Fields*, 40 S.W.3d 435, 439 (Tenn. 2001).

The Defendant references modifications to similar drug laws in other jurisdictions; however, as the State correctly notes, those modifications were all made through legislative

action. In Tennessee, the legislature passed a law that is reasonably related to the state's legitimate interest in protecting vulnerable populations from the "dangers" incident to drug activity. The Defendant is not entitled to relief.

## B. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient for the jury to find him guilty because the proof established the defense of entrapment. The defense of entrapment is codified at Tennessee Code Annotated section 39-11-505, which provides: "[i]t is a defense to prosecution that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so." Tennessee applies the subjective test for determining whether a defendant has been entrapped into committing a crime, which "requires the fact finder to focus on the subjective intent of the defendant to determine whether the defendant was predisposed to commit the criminal act, with law enforcement officials furnishing only the opportunity, or whether the defendant was an innocent person induced by police into committing the criminal offense." *State v. Shuck*, 953 S.W.2d 662, 666 (Tenn. 1997) (citations omitted). Relevant factors to consider when determining whether a defendant was predisposed to commit a crime:

> include the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by law enforcement officials; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense which was overcome only by repeated inducement or persuasion by law enforcement officials or agents; the nature of inducement or persuasion engaged in by law enforcement officials; and any other direct or circumstantial evidence that the accused was ready and willing to engage in the illegal conduct in question. In determining predisposition a court or jury should consider the totality of the circumstances.

*Id*. at 670 (citations omitted). The trial court determines the threshold question of whether the defense of entrapment has been "fairly raised" by the proof, and "if entrapment is, in fact, 'fairly raised by the proof,' the issue of predisposition becomes a question of fact for the jury." *State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001) (citations omitted).

The Defendant argues that there was ample evidence proving that he was entrapped into committing the offenses. He asserts that because Mr. Fralix did not have a car, "he was entrapped into selling cocaine within 1,000 feet of a school." In support of his contention that his guilty verdicts should be set aside, the Defendant relies on his testimony at trial that he did not realize the trailer was in a drug-free zone and that had he known, he would not have agreed to sell the drugs in that location.

In the light most favorable to the State, the evidence shows that the Defendant agreed to bring cocaine to Ms. Spoon's trailer on three separate occasions. Mr. Fralix called the Defendant to request one gram of cocaine, and the Defendant agreed to bring the cocaine to Ms. Spoon's trailer. The video recordings of all three transactions show the Defendant entering the trailer home and giving a small item held in his hand to Ms. Spoon. Ms. Spoon then hands the Defendant cash. During one of the three transactions, the Defendant urges Mr. Fralix and Ms. Spoon to purchase a larger amount of cocaine from him the next time. He also sought advice from Mr. Fralix on the price he should charge for morphine pills. At trial, the Defendant admitted that he intended to sell cocaine to Mr. Fralix; he also admitted that he sold drugs to persons other than Mr. Fralix and Ms. Spoon. The Defendant said that he had lived in Maury County most of his life and knew the location of Columbia Academy. This evidence supports the jury's finding that the Defendant was predisposed to sell the drugs and that Mr. Fralix, who was working with police, provided the opportunity. Although the Defendant explained that he felt pressured to sell Mr. Fralix drugs at the trailer because Mr. Fralix did not have transportation, the jury obviously discredited this explanation. This was the jury's prerogative. Taken in the light most favorable to the State, the evidence was sufficient for the jury to reject the Defendant's defense of entrapment.

## III. Conclusion

After review of the record and applicable law, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE